Good afternoon, Your Honors. Catherine O'Daniel on behalf of the Avalanche Corrie Webb. Good afternoon, Your Honors. Claire Connelly, or Claire Wessel-Connelly, Assistant State's Attorney, on behalf of the people of the day. The way I read the people's brief is that they have confessed error as to two of the issues, so I'm going to contain my arguments to the remaining two issues unless the Court has any questions about the issues that were conceded by the State. And with that, I will turn to the probable cause, the arrest, the motion to quash arrest. It is our respectful contention that the trial court got it wrong with respect to its ruling on defendant's motion to suppress evidence. The facts and these motions are always very factual-driven, and this is no different here. The police happen by a large crowd. They are not called there. They have received no citizen complaints. But they happen upon a crowd. And depending on which day you listen to Officer Huberts, that crowd is 20 to 30 people or 30 to 40 people. Nonetheless, it's a crowd. Officer Huberts and Officer Smith are riding in their car together, and they go off and they meet up with — Was Webb part of that crowd? There was a — Hubert testified that he was talking to four or five people on the sidewalk? Well, it's an interesting question, Your Honor, because Huberts testified — Officer Huberts testified that he saw Mr. Webb, but Judge Davey found — there's no — in the crowd. Judge Davey found that was simply an assumption and that there was no evidence that he actually ever saw him in the crowd. And during the motion to suppress, there was a lot of testimony about that point because Officer Huberts' preliminary hearing testimony diverged pretty dramatically on that point, Your Honor, raising — Didn't he say he first saw him — Huberts said that he first saw him 20 or 25 feet away? Correct. So that doesn't sound like somebody's on the sidewalk. That's exactly right, and that's an interesting issue given the state of the statute at that point in time. Well, what I find most interesting is that these officers meet up with other officers and they form a plan. And Officer Huberts' language, not the defense's language, is that the plan was to disperse this crowd, which means scatter them. And the plan was very specific. We will converge. We'll converge from the east, and the other officers will So the other officers arrive first, and they begin dispersing the crowd. There is no testimony as to what words they used, but everyone agrees they gave verbal commands. And I don't think it can be denied that Mr. Webb obeyed those commands because he began to disperse. The testimony was that the scene — and this is police testimony — the scene was chaotic and people were running in all different directions. And with all due respect to Judge Davey, he later found, he made a factual finding, that Mr. Webb was the only person who ran in the direction of Officer Huberts. That finding is simply not supported by the record, and I think that's an important note to make to Your Honors. Well, if the police are coming in from the back and from the front, I mean, you're going to be running towards an officer no matter what, aren't you? That's exactly — From where I understood the situation? That's exactly correct. And so — I mean, if that doesn't mean he was running at the officer, he was running away as other people were running away. I reread the motion today, and it struck me that the testimony was that Mr. Webb is looking over his shoulder at the officers who are telling him, get out of here. And as he's doing that, he's running toward Officer Huberts. So I think Judge Davey's finding that my client was running toward Officer Huberts, and that because this person is approaching him, he has the right to do this type of stop, which we argue is an arrest, we challenge that finding as well. Nonetheless, we all know that Mr. Webb is running, and he's running in the direction of Officer Huberts. But Officer Huberts also said that he wasn't running toward him. Officer Huberts says, we kind of met. I was going east, Mr. Webb was going west. However you break it down, the fact is clear. Mr. Webb was obeying police orders at the time. He was dispersing away from the officer who was, who had arrived there earlier and was telling him to, you know, and everybody else there, to leave the scene. But Judge Davey did say that there's no evidence in the record that Officer Huberts ever even saw Mr. Webb in that crowd. And if they're there to investigate a crowd disturbance, and he never even sees Mr. Webb in the crowd, it kind of, it kind of handicaps his belief that Mr. Webb was doing anything worthy of a police investigation. Isn't that a key thing that he thought he was carrying a weapon, the way he was running and holding his, the front of his pants? The key question in my view is whether or not that alleged belief was reasonable. Here we have Mr. Webb, and everybody testified consistently that he was dressed in baggy clothing that evening. Now, let's just, baggy clothing. What does that mean, in that community, baggy clothing? I mean, baggy clothing means what? Zero. Baggy clothing is the style of the day. And I was thinking to myself, you see baggy clothing, hold on. Well, what does that mean, baggy? I mean, is that...  Sag, sag pants. Saggy pants. The wording, to me, is important. I mean, baggy clothing is not large clothing. Larger, you know, people wear large clothes. But here, it's the way the pants are hung low on the waist. Correct. And in fact, they're hung so low, and they're loose-fitting, I think is a good description. And so, because that's the fashion of the day, what's to indicate someone's armed versus someone is running, the police have told them to go, and they're running, and they have to hold their baggy pants up in order to run. But the officer actually was asked that question. Did he see other people during his experience with so-called baggy clothing holding him to a weight? And he couldn't even estimate how many times he had seen people do that. Correct. He said 100 to 200 times he's found people with, over 10 years, people with weapons in their pants. And he couldn't even put a number, as Your Honors noted, a number on how many times he's seen baggy clothing where people didn't have weapons. But one thing is clear. He did very clearly testify, and he conceded, that not every person in baggy pants is carrying a weapon. And whether or not his belief that Mr. Webb had a weapon was reasonable, he didn't see an outline of a weapon. He didn't, there was no testimony that he saw Mr. Webb seeming to have to hold something up. There was no testimony that he asked Mr. Webb anything about a weapon. And if this was a Terry stop, officers are allowed to stop and identify themselves and ask questions. That got entirely skipped over. The officer went in favor, we believe, of a full-blown arrest, and it's our contention. Well, when you say about stop people and ask them, but the defendant didn't stop. Officer Huberts testified the defendant didn't stop, and Officer Huberts testified the defendant instead pulled away and said, no, no, no, no, no. Interestingly, though, he left any of that out of any report. Does this get to his credibility? Yes, absolutely. It goes to his credibility. His credibility was, you know, front and center at that, at Mr. Webb's trial for both of the remaining issues. And so it's our respectful contention that Judge Davey got it wrong with respect to whether or not viewing Mr. Webb the way he was dressed, the way he had his hands on his waistband, and he didn't seem to have his hand on any object, just on his waistband. Didn't Hubert testify he didn't see him committing a crime? That's correct. He didn't see a gun? That's correct. He didn't see a weapon? He didn't see a bolt? He didn't see any shiny object? I mean, he saw nothing. And the whole situation, as I understand it, the whole, from start to finish, was eight seconds or less. I mean, two to eight seconds. I mean, so it could have been two seconds, which is really big. Hubert's testimony is two to eight. So the longest is eight, but it could have been two. Correct. Which gives you, I mean, the guy was, Webb was taken down. I mean, two seconds, that's pretty fast. I mean, you don't have time to even stop. If you're running and somebody says, officer, stop. Not only do you not have time to stop, but did Officer Hubert in two seconds have the time to make the judgment call that's necessary and required by Terry and required by the decision whether to make an arrest, which has to be justified by probable cause. We respectfully contend two seconds is not enough. The probable cause, as I understand it, would be holding one's pants, baggy pants, around the waist involuntarily, which people run, if you're running and you have baggy pants, you may involuntarily want to hold your pants up. So, I mean, but isn't that, is that, am I missing something? Is there anything else that would have caused Hubert to stop, Webb? Absolutely not. He wasn't committing any crime. He wasn't seen committing any crime. He wasn't heard to be creating any noise. And there's that little issue, or maybe big issue, was he even in the crowd to begin with? Does it matter if he was in the crowd? I don't believe it matters if he was in the crowd. I think it might matter as to where he was seen, you know, whether he was in that grass or on the sidewalk. That might matter. And that's one of the reasons why I asked this Court's permission to cite additional authority during the argument, is because of this Court's opinion in Horton. It might have mattered to that analysis. But even Horton aside, this was a chaotic scene, people running in all different directions, and Officer Hubert sees a man not even looking at him. So that's why I don't think that Judge Davey's factual finding that it appears that Judge Davey believed that Mr. Webb was making a beeline toward Officer Hubert, I don't think that's supported by the record, especially when you consider he's looking over his shoulder, not even looking at him. So Officer Hubert, to give him the benefit of the doubt, if it was eight seconds, he sees someone running, holding his waist, looking over his shoulder. We simply maintain, as we did during the motion to suppress, that that's absolutely not enough. It's not enough to give him enough to do a carry stop, let alone a full-blown arrest. And... If it wasn't an under arrest, then he was tackled. Absolutely. And kicked in the face and everything else that happened. He wasn't afraid to leap, was he? Absolutely not. He had a broken jaw. So he was detained, not under arrest. I think he was under arrest when... Well, did they announce he was under arrest or did they detain him? He was effectively detained. And detained is the question for probable cause, carry stops, everything else. Correct. He wasn't under arrest. Well, we... I mean, arrest is a technical term. Well, I've always... You can be detained without being arrested. That's absolutely true. But generally speaking, when you're detained, you're not grabbed by the shirt, thrown to the ground, and have your jaw broken. There's no question. But that doesn't mean you're arrested. And being detained is... Go ahead. With your arrest warrant. Okay. We believe he was arrested. And we believe that, and we submit that there was not probable cause to support that arrest. And one of the things that the factual... One of the things that came out in the facts of the motion to suppress, the officer, Hubert's, first felt a weapon or first knew that a weapon was present or suspected one was in his pants was after he'd already struck Mr. Webb in the head and had him on the ground. Now, he changed that, completely changed that at the trial when he said that he pushed him up against the wall and felt the weapon there. At the motion to suppress, he maintained at all times he did not feel a weapon until he had already taken Mr. Webb to the ground. And then when he couldn't get Webb to let his waistband go, he hits him a bunch of times. And then, in only event, does he feel a weapon. How do you reconcile... I mean, the testimony that there's a wall. I mean, we're in an open area. All of a sudden, he's up against a wall or he's down on the ground. How do you get... He gets on the ground first, as I understand it, from Hubert's testimony, right? At the motion to suppress, there was no wall. Right. That's what I'm saying. Yes. I mean, how... How, at trial, is it reconciled with regard to there's all of a sudden a wall and he's on the ground? We know he's on the ground. We know that he hit him and kicked him and so forth, whatever happened on the ground. What happened at trial with regard to the wall? Where did it come from? Do we know where it is? I don't think it's reconciled to this day because it certainly was in no police report. And it certainly was never mentioned at the preliminary hearing. It was never mentioned at the motion to suppress. The wall makes its first appearance at trial, and coinciding with the officer feeling the weapon as Mr. Webb is up against the wall. Did we know from trial that it was up against the wall after he was tackled and so forth? At trial, Officer Hubert's blessing testified that he put Mr. Webb up against the wall first, then felt the weapon, and then threw him to the ground. So it was a completely different story, which is why, and I think I need to mention the high crime area because Judge Davey made his ruling based on the People v. Jackson case where police come up upon an individual who's acting bizarrely, and they command him to put his hands on the car. And he puts his hands on the car, takes them off, puts his hands on the car, takes them off, and he's saying unintelligible mumblings to the police. And in that case, this court said that the police were justified in the further investigation because of two things, and it's important to note two things. It happened in a high crime area, and the defendant was acting bizarrely. In this case, there was absolutely no testimony at the motion to suppress that it was a high crime area, and Judge Davey noted that twice when he was making his ruling. But he relied upon People v. Jackson nonetheless because he said that he believes, Judge Davey believed that the officer, because of Mr. Webb's actions in running toward the officer, was justified in a further investigation. I've addressed that, Judge Davey's ruling regarding Mr. Webb running toward the officer, and we respectfully contend that is not a bizarre action. That is Mr. Webb obeying orders to disperse and nothing more than that. And again, there's no evidence whatsoever that it was a high crime area. And I want to just point out a couple of quick things. Judge Davey ruled that Officer Hubert's feeling that Mr. Webb might be in possession of a weapon was merely a hunch. We think that part of the ruling is right on the money. It was merely a hunch. And that did not, that hunch did not rise to the level of probable cause to support the arrest, which is what we contend happened. And the arrest is literally defined as that point in time which you are no longer free to go. And I think the State even conceded that the seizure of Mr. Webb's person occurred once the officer placed his hands on Mr. Webb's shoulders and brought him down to the ground. He was undeniably seized, and I don't even think that's contested. We believe that's an arrest, and we believe that that arrest was not supported by probable cause. And we are asking the court to find that Judge Davey improperly denied Mr. Webb's motion to suppress. Briefly, with respect to the other issue, the IPRA issue. You're out of time, but if you want to just quickly cover it, because we have credits. Okay. We believe that based on this court's authority in Wilson and in Aderhart, that Mr. Webb should have been able to introduce evidence of the IPRA investigation itself. But in this case, not only was he not allowed to do that, he was not allowed to impeach Officer Huberts with prior inconsistent statements. With respect to Officer – they were inconsistent statements from Officer Huberts' trial testimony regarding the conditions under which Mr. Webb made these three alleged inculpatory statements, which Mr. Webb denied making. And the reason it's so important is that Officer Huberts and Officer Smith were the State's star witnesses. They were the only witnesses to testify to his arrest, the injuries he sustained, the recovery of the weapon, and these statements. This was a – if you just look at the jury's notes back and forth with the court, they were having a hard time with this case. They twice sent notes to the court that they were deadlocked. That indicates by any examination that they were having a hard time reconciling the evidence. Only after a print instruction when the court added the, if you can't come up with a verdict, I'll bring you back on Monday, and then I'll bring you back again on Tuesday if you still don't have the verdict. Lo and behold, they go back in the jury room and they come back with a verdict of guilty. And during the selection, it was made clear some of these jurors had – they were told it would take a week. Some of them had x-rays lined up and out-of-town flights. And we believe this was very prejudicial to the defendant. He should have at least been able to confront Officer Huberts with prior inconsistent testimony given at the IPRA hearing with respect to the timing of these defendants' three alleged statements and whether they were made during processing or whether – I'm sorry – whether Mr. Webb asked to go to a hospital during processing. But then the judge said that he would allow in the result of the police shooting, right? No, he said he would not allow it in. But if – I thought he said he would if he was going to put that in, the evidence. Oh, I understand your question. I misunderstood you. Yes, that's correct. That's correct. That is how – yes. If you're going to do that, then you've got to take – You open the door. If you open the door, then they can – it opens the door for them. And that was what the judge did itself. What's wrong with that? Well, nothing's – How is that unfair? Nothing – I don't think that that in itself is inherently unfair. But then when the officer gets up there and is allowed to testify that he only first found out Mr. Webb was asking to see a doctor after Mr. Webb had given these three statements and he was off in a lockup, when he testified at the Ipler hearing that Mr. Webb made three statements between 1.30 and 3.30 in the morning, but he was confronted with other statements that Mr. Webb asked to see a doctor during processing. Processing occurred before these statements ever happened. And why is it unfair? Because the jury was given an instruction, go back and determine whether or not the statements were even made. And if you determine they were made, what weight do you give them? And you should consider all of the circumstances. In our view, they were not allowed to hear all of the circumstances because the trial court cut trial counsel off and said you can't go there. And it was a prior inconsistent statement. And so the jury should have been allowed to hear that because it went to whether – went to the credibility of the statements. Thank you very much. Thanks. Yes? Good afternoon, your honors. The officer in this case conducted a proper chair stop based upon his experience and the defendant's unusual conduct in this case where the defendant was running towards Officer Hubert. Well, what's unusual about running when they're being asked to dispersed? I'm not saying that the running is unusual. Okay, so what's unusual? Unusual, the unusual is the defendant placing both of his hands in the front of his waistband and grasping onto it as he was running away from one set of officers and looking over his shoulder. So, it sounds like a catch-22 because the officers are surrounding this group from the rear and from the front and asking people to disperse. Correct. And people, it's chaotic and people are running. Correct. And you said there's nothing wrong with running. He was wearing baggy pants, pants lower on his waist. Correct. Okay. And the officer testified that he couldn't even estimate how many times he's seen people with those pants. You have to hold them up. Correct, yeah. So, what's wrong with that? The officer didn't stop the defendant because he was wearing baggy clothes or whatever it was. Oh, he didn't? He stopped him because he had both of his hands clutching onto the front of his waistband. Well, that's what he did. And then the officer suspected that he had seen. He had a hunch, right? He suspected, it was not a hunch. A speculation, he had a speculation. Incorrect. It's a reasonable, articulable suspicion. Oh, now you're saying suspicion, but before you said speculated. So, which is it? I apologize if I use the word speculate, but suspicion. Okay. He had suspicion because he's holding up his pants when he runs. So, people in the city of Chicago cannot run if they have baggy pants and are holding them up. And that is not what I'm saying in this case. Then what are you saying? Did he see a gun? Did he see a gun? He did not see a gun. Did he see a bulge? And he does not need to see a gun. Did he see a bulge? No, he did not. Did he see a crime? No, he did not. All I saw was somebody running, holding up their pants. Is that correct? No. Oh, okay. He saw the defendant clutching the front of his waistband. What do you mean clutching? You used the word clutch. The officer used the word clutch, from what I recall, as he used it. He was holding on to the front of his waistband. He was holding on or he was clutching that? To me, those two terms are interchangeable. I apologize if you feel differently. No, no, I'm saying if you clutch or you hold, you're still holding your pants. You're keeping them up. Correct. And as the Illinois Supreme Court has found, where possibly innocent conduct also suggests criminal activity, an investigative stop is justified to resolve the ambiguity. Where's the ambiguity? The officer, someone else may see what the defendant did in this case and think of it as innocent conduct. The officer in this case, based upon his experience, which he testified to at the hearing, was that he looked at this conduct and he had seen it previously. And he had, and based upon his experience, he had seen people holding or clutching onto the front of his waistband in the same manner. So that's not a crime? No, we're not saying it's a crime because it's a hearing stop. Why did he have, I don't understand how that is a carry stop, that somebody has been asked to leave the facility and is running and if he turned around, his head was the other way, if he turned around he would have ran towards officers that way. Instead he's running this way, you know, the opposite way. Correct. And this all takes place, you agreed, the testimony is two to eight seconds. No, actually what happened, the testimony is that he was running and then the officer said stop, police, and the defendant ran an additional two to eight seconds. That's what I have in my notes from what happened, from his testimony. I have, from the time you saw him, the whole incident took two to eight seconds. That's not what I have in my records, so I apologize if it's different. But there was, because my argument was that there was, and the initial time that he was running, I'm not saying that that constituted flight, because that would be disingenuous on my part. When police officers come and tell someone to disperse and they run, that's not flight in the normal sense. There was a short amount of flight on the part of the defendant, and that's why I say the defendant ran another two to eight seconds, because the officer said stop, police, the defendant did not, and then the officer put his arms up on the defendant's shoulders, and we agree that that was the initial stop of the defendant when he was detained by the officer. So at that point, the officer needed to have a voluntary stop, and we believe that it did. And I will also refer this Court to the case of People v. Salgado. In Salgado, this Court found that this type of unusual conduct when the defendant was running, and he had repeated movements towards his front waistband, which is exactly Well, now you're saying movements. Where's the movements? You said he was holding his pants. Right. Well, now you're talking about movements. It's the furtive movements. Did he testify to furtive? No, he did not. Okay, so that's how he testified. I did not describe it as furtive. I'm describing it as furtive movements. I know. And that's a legal term. That's a legal term that people use in order to describe conduct. The officer did not describe it that way. Correct. I'm describing it that way. I want your argument. I want to know what happens in the record. The officer testified that someone coming in an opposite direction, he's seen people with opposite direction holding their waistband, I believe is certainly behavior that would justify a further inquiry for officer safety. So just the fact that somebody's running, holding their pants, this officer believes there's a safety issue. I don't get that. I don't get it. So in the city of Chicago, if somebody is running, holding their waistband, every officer has a right to stop the person. If they're running, then the officer has to be standing. In the manner that the defendant was holding his waistband, yes. But there was no indication of any manner other than holding his pants. He was holding on to his waistband. And again, I would direct you, it's the same circumstances that were in Salgado. So in that case, all the officers had was the defendant was walking with his friend, and then all of a sudden when the officers approached, he looked in the officer's direction, walked in a different direction from his friend, and then he was making repeated movements towards his waistband. This is different. The record doesn't show any movements towards the waistband, does it? Yes or no? There was an initial movement towards the waistband. Was there repeated movements? No. What's the initial movement? Because he has to at some point grab on to his waistband. So that's not right. You can't initially grab or can you? You're saying that's okay? I'm trying to figure out. I'm not following what you're trying to do. Apparently it's important that he initially did it. Initially did it because he has to in order to be able to show that he grabbed on to his waistband. At some point, he grabbed on to his waistband. So what? According to Salgado and Johnson, there's also another case in which the defendant was running and holding on to the front of his waistband, and that was relied upon by this appellate court to find that that constituted enough to have a valetary stop in this case. You do not have to have certainty that a defendant is armed. You do not have to have certainty. I'm not talking about certainty. You don't have to. I'm talking about any kind other than running and holding his waistband. We don't have evidence. We submit that that's enough. And also in addition to that, we also have evidence that was introduced at trial regarding the fact that this was a high-crime area. Oh, so what's that mean, high-crime area? Please define that. Where in the record? What does it define? How do we know that? We did not define it in the record, but the officer explained what the high-crime area was in this case. He had been working as an officer for 10 years. He had been working in this district for 5 years. And during that time, he had made previous gun and drug arrests at this very intersection. So what does that have to do with this individual? That has to do with this individual because that's what the United States Supreme Court has found is relevant in determining whether or not a voluntary stop is valid. The neighborhood? Correct. You can look at the circumstances. So people in neighborhoods where there's so-called high-crime neighborhoods do not have the same constitutional rights as people in other neighborhoods in the city of Chicago? That is not what I'm saying, and that is not what the United States Supreme Court has found. The United States Supreme Court, in world law, has found that this court and every other court in this country can rely upon the circumstances and the surrounding neighborhood in which a crime occurs. Things are changing, and world law is a different situation, a much different case. Many years ago. Today, to say that people in certain neighborhoods in the city of Chicago have different rights simply because of the neighborhood itself that an officer believes to be high-crime. I'm not understanding the following of that argument. Well, I'm not saying that people's constitutional rights vary by their zip code or by their neighborhood. What I'm saying is that my argument is based upon what the United States Supreme Court has found, and it's not been overruled by the United States Supreme Court at any point. So I think it's a valid basis for the trial court, for the officer to rely upon, and this court to rely upon in determining whether or not this was a voluntary stop in this case. Would anybody mind if we get on to the IPRA issue? That's all right. Unless you guys have any more questions regarding the chair stop? I don't, but that's why I'm asking. Does anybody mind? No. Because otherwise we'll be here until Friday. And I want to be home by Saturday. Defendant in this case cannot establish that the trial court abused its discretion, restricting the defense from presenting evidence that the defendant had filed an IPRA claim against the officer. An abuse of discretion standard, which is applicable in this case, is when no reasonable person would take the view adopted by the trial court in this case. Moreover, the trial court's ruling will not be overturned unless abuse of that discretion led to manifest prejudice against the defendant. Defendant cannot establish either of these. When the trial court was considering the miscibility of this evidence, both parties had presented case law, and defendant sided to People v. Wilson, and the State relied upon People v. Sykes and Williams. So when we're looking at whether or not no reasonable person would have taken the view adopted by the court, a prior court has already taken the view that that was adopted by the trial court. But the trial court in this case obviously adopted the view that was relied upon in People v. Sykes, where this court had already held that it was not error to restrict this type of evidence, and that the defendant did not show that he was manifestly prejudiced by the trial court's refusal to allow him to introduce testimony that the defendant had filed a disciplinary complaint with OPS against the police officer. Well, I thought part of the argument was that there was impeachment that they wanted to introduce from the Imperial hearing. Correct. And that was denied. No. Well, actually, what happened in this case was the trial court ruled we – the State had filed a pretrial motion in limine. The court said, I'm going to allow the defense to bring in the prior inconsistent statements for impeachment purposes. Okay. The only restriction would be that the juror would not learn that it occurred during an IPRA proceeding. So the actual nature of the proceeding – In other words, you can ask, did you testify previously that – As a prior hearing. Correct. Correct. So the trial court in this case wanted to use the language of a prior hearing as opposed to an IPRA proceeding. Okay. So the defendant was allowed to introduce this evidence, you know, if he sought. It was just the fact that it didn't happen in an IPRA proceeding in this case. Okay. So we find that the trial court's decision in this case was based upon – it was valid based upon its reliance upon the case of Pieper v. Sykes. And – And did the defendant choose not to bring in that impeaching testimony? I don't recall, to be honest with you. I don't recall that he actually did bring that in. I could stand corrected. I don't remember, to be honest with you. Fair enough. And as far as any error in this case, we'd also ask that this Court find that it was harmless error. The trial court was going to allow the prosecution to present evidence that the IPRA complaint had already been resolved and that it would have been found to be unfounded in this case. And that is allowed pursuant to Pieper v. Everhart. Because the Court in that case had found that if you're going to allow in the fact that there was an OPS or IPRA or COPA, whichever authority you're referring to, the results of that claim is also admissible. So the jury would have also known that any complaint that was filed against the officer was unfounded. Moreover, the jury also heard the testimony of Officer Smith, which collaborated Officer Huber's testimony about the fact that the defendant had a gun in his waistband. And the evidence technician explained why there were no latent fingerprints found on the defendant's gun, magazine and bullets, explaining the rarity in finding such prints and the condition of the defendant's gun that was recovered as being heavily scratched in this case. And, Mr. Honors, have any other questions? The people respectfully request that the defendant's conviction be affirmed in this case. Thanks. 60 seconds. Then you can answer your phone. I do apologize for that. It's one of my worst nightmares, and it actually happened. So page 98 of the supplemental record is where it's found that it was between 2 and 8 seconds between the time Huber's first saw Webb until the time he took him down to the ground. So I just wanted to correct that. And one thing that I didn't address and should have is there's another reason why, in addition to this one, where it was a police order and Mr. Webb obeyed it when he was running, there is a strong reason why people don't want to have interactions with police. And that's why I wanted the cite to Horton. I won't belabor that point. I know the court well knows that point. And I think that that may also have been at play here and maybe rightly so for Mr. Webb because of what happened to him. And then just very quickly with respect to the Salgado case, it's completely inapposite in this case because in that case there was evidence at the motion that it was a high crime area. We didn't have that at the motion. And I don't think the court should credit the later trial testimony given Officer Hubert's complete reversal of testimony and his massive impeachment with what was in his police reports and what he came up with at the motion and then what he came up with at trial. I don't think his credibility is such that it merits consideration of his trial testimony. That's your call, not mine. And the second thing with Salgado is that there were furtive movements, repeated furtive movements to that individual's waistband. And that is why that case. I didn't see the word furtive in the record here. Is it? Not here, but in Salgado. I'm not talking about Salgado. It's not here, Your Honors. Correct. The question was whether it's here. Correct. And then my final point is with respect to the IPRA issue, it wasn't we should have been able to talk about IPRA to the jury, and that would have been consistent with this court's precedent. That's our feeling. But the court said we can't do that, and if we do it, we open the door. Okay, we live with that. But what the court didn't let us even do is we wanted to ask you, Officer Hubert, isn't it true Mr. Webb told you he wanted to go to the hospital? That is a huge issue. It goes to the conditions, all of the conditions the jury is supposed to consider when they evaluate statements. Webb denied ever making statements, and Officer Hubert and Officer Smith were the only individuals who testified for the state about the arrest, the interrogation, the injuries, and all that stuff. And so that question, did he ever tell you he wanted to go to a hospital, that was not going to introduce IPRA. That was a prior inconsistent statement. If the officer had testified, if we'd been able to ask that question. Did you make an offer of proof? I didn't try the case, and I don't believe in the record that there was an offer of proof. It was just one. If there's no offer of proof, what do we do with that? Is that a waiver or forfeiture or whatever? Well, you can still consider plain error. I don't know what the answer would have been. If I had to put myself in Ms. Engel's shoes. No, it's just a point that, you know, appellate counsel many times reads the record and sees things with fresh eyes, come up with fresh issues. But a lot of times it doesn't happen in the record, so we can't do anything about it. Without an offer of proof. I understand. I understand. There was no, I don't believe there was an offer of proof. Thank you very much, Your Honors, for your time and consideration. Thanks again. Great job. We appreciate it, and we'll be hearing from us soon. Thank you.